IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JENNIFER M. WILKE, | 4:16-cv-00465-JAJ-RAW |
| Plaintiff, | |
| vs. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security,[1] | REPORT AND RECOMMENDATION |
| Defendant. | |

Plaintiff Jennifer M. Wilke seeks review of a final decision of the Commissioner of the Social Security administration ("Commissioner") denying her claim for Disability Income Benefits ("DIB"). 42 U.S.C. § 405(g). The matter has been referred to the undersigned for Report and Recommendation.

## I.

## PRIOR PROCEEDINGS

Ms. Wilke filed her DIB benefits claim on August 2, 2013 alleging disability since June 28, 2013. (R. 19, 156-62).[2] She alleged epilepsy and depression limited her ability to work. (R. 183). Her claim was denied initially and on reconsideration. (R. 69, 112). Ms. Wilke requested an

---

[1] Nancy A. Berryhill, became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Federal Rule of Civil Procedure 25(d)(1), she is substituted for Carolyn Colvin as Defendant in this suit, which may continue without further action. *See* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

[2] All citations are to the administrative record.

administrative hearing. Administrative Law Judge ("ALJ") Thuy-Anh T Nguyen conducted an administrative hearing on June 22, 2015.

The ALJ issued a decision on August 5, 2015. After applying the familiar five-step sequential evaluation analysis prescribed in the social security regulations, *see* 20 C.F.R. § 404.1520(a), the ALJ found Ms. Wilke was not disabled. (R.16-36). With respect to the first three steps, the ALJ found Ms. Wilke had not been engaged in substantial gainful activity since June 28, 2013, that she suffered from the severe impairments of epilepsy and a depressive disorder, and that these impairments did not equal the severity of one of the listed impairments in the applicable regulations. (R. 21-22).

At the fourth step the ALJ found Ms. Wilke had the residual functional capacity ("RFC"):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: She must not climb ladders, scaffolds, ramps, or stairs. She is capable of occasionally balancing. She must not work around hazardous machinery or unprotected heights.  She cannot operate a motor vehicle. Work is limited to simple, routine, repetitive tasks in a low stress job, defined as having only occasional decision-making and changes in the work setting.

(R. 22-23). The ALJ further found that Ms. Wilke is unable to perform any past relevant work. (R. 30). Finally, at the final fifth step, the ALJ determined there were jobs existing in significant numbers in the national economy which Ms. Wilke could perform, adopting the vocational expert's ("VE") testimony that a person of Ms. Wilke's age, education, work experience and RFC could work as a laundry worker II, hand packager, or housekeeper. (R. 30-31). The ALJ's findings added up to a final determination that Ms. Wilke had not been under a disability from June 28, 2013 to the date of decision. (R. 31).

Ms. Wilke requested review by the Appeals Council. The Appeals Council denied her request on June 14, 2016. (R. 1-5). The ALJ's decision thus became the Commissioner's final decision. On August 17, 2016 Ms. Wilke filed her Complaint in this Court.

## II.

## ISSUES PRESENTED

Ms. Wilke presents four issues for judicial review:

(1) She suffers from a "cortical malformation" of her brain which is a severe impairment the ALJ failed to recognize;

(2) The ALJ's RFC determination is not supported by substantial evidence based on the record as a whole;

(3) The ALJ's hypothetical question to the VE which the ALJ credited was inaccurate leaving the VE's testimony unreliable; and

(4) The ALJ's adverse credibility assessments of Ms. Wilke and her mother are not supported by substantial evidence.

It is not necessary to separately discuss the third issue because Ms. Wilke's challenge to the hypothetical question posed to the VE is based on the adequacy of the ALJ's RFC determination on which the hypothetical question was based. She restates her criticisms of the RFC finding as criticisms of the hypothetical. (Pl. Brief [11] at 12-13). Issues 2 and 3 thus merge.

## III.

## STANDARD OF REVIEW

This Court "will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011)(quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)); *see Lawson v. Colvin*, 807 F.3d 962, 964 (8th Cir. 2015); *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013); *Young v. Astrue*, 702 F.3d 489, 491

(8th Cir. 2013); 42 U.S.C. § 405(g)("The findings of the Commissioner of Social Security as to

any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Substantial evidence is less than a preponderance, but is enough that
> a reasonable mind would find it adequate to support the
> Commissioner's conclusion. To determine whether substantial
> evidence supports the decision, we must consider evidence that both
> supports and detracts from the decision. If substantial evidence
> supports the ALJ's decision, we will not reverse the decision merely
> because substantial evidence would have also supported a contrary
> outcome, or because we would have decided differently.

*Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010)(internal citations and quotation marks

omitted); *see Cypress v. Colvin*, 807 F.3d 948, 950 (8th Cir. 2015); *Phillips v. Colvin*, 721 F.3d

623, 625 (8th Cir. 2013); *Kamann*, 721 F.3d at 950; *Young*, 702 F.3d at 491. The ALJ's decision

will not be overturned so long as the decision "falls within the available zone of choice." *Buckner*

*v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011); *see Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir.

2009)(quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "The ALJ's decision 'is not

outside the zone of choice simply because [the Court] might have reached a different conclusion

had [the Court] been the initial finder of fact.'" *Heino*, 578 F.3d at 879 (quoting *Bradley*, 528 F.3d

at 1115); *see Buckner*, 646 F.3d at 556. If two inconsistent positions may be drawn from the

evidence and one of those positions represents the agency's findings, the decision must be affirmed.

*Chesser v. Berryhill*, 858 F.3d 1161, 1164 (8th Cir. 2017).

## IV.

## THE RECORD

Hearing Testimony

Ms. Wilke, 43 years old at the time of hearing, testified she lives with her husband in a

house in Des Moines. (R. 44). She said she did laundry and dishes, but not much cooking because

she is afraid she might hurt herself. She breaks up her household chores to take time to rest. (R.

45). She goes with her husband to get groceries. Her husband drives. Ms. Wilke does not have a driver's license. (R. 44).

Ms. Wilke is a high school graduate. While in high school she took special education classes in social studies, writing and reading. (R. 45). At one point she received SSI benefits for her epilepsy, but chose to return to work. (R. 45). She worked at Orchard Place in Des Moines where, she testified, she was accommodated with more breaks. She was terminated when her job was eliminated, and has not worked since. (R. 45-46).

Ms. Wilke testified she has had seizures since birth, the result of a "cortical malformation" of her brain. (R. 46). She said she was unaware when a seizure was occurring and does not pass out. A lot of times she does not know she has had a seizure (R. 47). But she believes the seizures last two or three minutes over a period of two to three hours. (R. 47). She testified the seizures leave her tired, confused, dizzy and make it hard for her to concentrate. Sometimes she has post-seizure headaches and becomes forgetful. (R. 47-49). Sometimes she stumbles or falls. (R. 49).

Ms. Wilke believes she has seizures three or four times per day. (R. 49). Seizure activity has varied over the years. Ms. Wilke testified the seizures are more frequent now than before. She described having "two or three to five" bad days a week when she would not be able to go to work because she was so tired. (R. 50).

Ms. Wilke testified she had been treating with a neurologist, Dr. Waldman, for about three years. (R. 51).  Dr. Waldman has prescribed medication and adjusts Ms. Wilke's "vagus nerve stimulator" ("VNS"). Her treatment has been helpful. (R. 52). However, the stimulator sometimes affects Ms. Wilke's eating and swallowing, and makes her voice scratchy. (R. 52). One of her medications makes her dizzy. (R. 55).

Ms. Wilke did not testify much about her other impairment, depression, though in answer to questions from the ALJ said her antidepressant medication made her tired. (R. 56).

Ms. Wilke's mother, Mary Jane Moore, testified. She said she sees her daughter about once a week for a few hours. They go shopping. (R. 58). She has been with her daughter when her daughter has had seizures. At the longest they last five minutes. According to Ms. Moore, Ms. Wilke's head and arm go down, and she gets stiff and immobile. (R. 59). Ms. Moore described her daughter as becoming "real tired" and ready for a nap after a seizure. (R. 59). The tiredness lasts "maybe the rest of the day." (R. 60). Ms. Moore testified her daughter's seizure activity gets better for a while, and then worse. On several occasions Ms. Wilke has lost bladder control, the last time about a year before the hearing. (R. 60-61).

Last to testify was VE Randall Harding. The ALJ posed four hypothetical questions to the VE, the second of which became the ALJ's RFC finding. Assuming a person of Ms. Wilke's age, education and work history, with no exertional limitations, but who must not climb ladders, scaffolds, ramps or stairs, could occasionally balance, but not work around hazardous machinery or unprotected heights or operate a motor vehicle, and whose work was limited to simple, routine, repetitive tasks in a low stress job with only occasional decision making and changes in work setting, the VE testified such an individual could not perform Ms. Wilke's past work, but could work as a laundry worker II, in housekeeping, or as a hand packager. (R. 63-64). When the ALJ added limitations that the individual would have to be absent from work at least three times each month and require three unscheduled breaks per day, the VE testified the three absences a month would eliminate all jobs. (R. 66). On examination by Ms. Wilke's attorney, the VE testified that side effects of drowsiness, dizziness, and confusion which made it so the individual could not work at a competitive pace for at least 25% of each workday would also eliminate all jobs.

Treatment Records

The administrative record contains medical records for Ms. Wilke's relevant treatment by the neurology department at the Mayo Clinic on one occasion and afterward by the neurology clinic at the Broadlawns Medical Center in Des Moines ("Broadlawns"). At the latter facility Ms. Wilke has principally been under the care of neurologist Dr. Wendy Waldman, M.D.[3]

*April 17, 2013.*  Ms. Wilke, accompanied by her husband and mother, was seen at the Mayo Clinic. A symptomatic partial seizure disorder was diagnosed, related to "a malformation of cortical development in the left hemisphere." (R. 268). Her husband reported witnessing approximately three partial seizures per week. Ms. Wilke was being treated with a combination of the medication Felbatol and vagus nerve stimulation which she stated had resulted in a reduction in seizure tendency. (R. 267).

*August 1, 2013.* Ms. Wilke saw Dr. Waldman for the first time at Broadlawns. "Non-provider information"[4] in the record of this visit reflects Ms. Wilke stated she had daily seizures and had been told she had two to three each day. (R. 286). She said she was happy with her seizure control "in terms of them being mild" and that the Felbatol had allowed her to have "marked decrease in intensity and seizures." (R. 283). Dr. Waldman diagnosed "refractory epilepsy." (R. 286). Ms. Wilke's Felbatol prescription was renewed and her VNS adjusted.

*September 18, 2013.* Ms. Wilke, with her husband, was seen again by Dr. Waldman. Dr. Waldman noted that Ms. Wilke has "a cortical malformation presumably causing seizures. 2-3 a day." (R. 278). Ms. Wilke's husband stated that with a bad seizure his wife could lose bladder

---

[3] Dr. Waldman is also referred to in the medical records as Dr. Waldman-Zadeh and Dr. Zadeh.

[4] From the structure and organization of the Broadlawns documentation of each visit it seems entries for "non-provider information" refers to information given by Ms. Wilke or her husband (who often accompanied her) to a nurse or other staff member prior to seeing Dr. Waldman.

control. They were not using the VNS magnet because the seizures weren't bad.  The non-provider note states Ms. Wilke reported having 2 to 3 seizures per day but her seizure activity was manageable. (R. 281). The VNS was adjusted and a new medication, Vimpat, prescribed in addition to the Felbatol.

*December 5, 2013*.  Ms. Wilke again saw Dr. Waldman. She apparently told the "non-provider" she had three seizures per week. Dr. Waldman wrote that Ms. Wilke had had "a few small seizures since I last saw her" on October 17[5] but "[n]o large seizures." Overall, Ms. Wilke was "doing pretty well on Vimpat." (R. 303).

*January 20, 2014*.  Ms. Wilke returned to Broadlawns to see Dr. Waldman.  The "non-provider" note indicates that Ms. Wilke was doing well with her seizures, and had one or two since the December visit. (R. 301). Dr. Waldman wrote that Ms. Wilke "is doing very well. She may have only had a few very small seizures." (R. 298). Her medications were renewed, the Vimpat at a reduced dosage.

*March 20, 2014*.  Ms. Wilke answered "I think so, probably" when the non-provider asked if she had had seizures since her last visit. (R. 321). Ms. Wilke reported dizziness and double vision on Vimpat. She was having problems getting insurance payment for both her medications.  Dr. Waldman wrote that Ms. Wilke was without Felbatol for three days and as a result had "a few more small seizures." (R. 318).

*July 2, 2014*. The non-provider note states Ms. Wilke was "having small seizures daily." (R. 331). However, Dr. Waldman's notes of their encounter state Ms. Wilke was "Doing well. No seizures" and that Ms. Wilke thought her medications were "dosed about right." (R. 329).

---

[5] The Court cannot locate a record of the October 17 visit.

*July 23, 2014*. On this date Ms. Wilke was seen by Broadlawns Physician Assistant Rebecca Purnell for a pre-operative evaluation in connection with scheduled surgery on July 24 to replace Ms. Wilke's VNS on the right side of her chest. Ms. Purnell's notes state that the VNS had helped Ms. Wilke significantly, but "she still has daily seizures." (R. 333).

*July 28, 2014*. Ms. Wilke saw Dr. Waldman. She complained her VNS had been feeling too strong after surgery and she was choking on her food. (R 337, 340). Some adjustments were made. Dr. Waldman wrote that "[i]f auras or seizures come back she will let us know." (R. 337).

*October 2, 2014*. Ms. Wilke, accompanied by her husband, returned to see Dr. Waldman. The non-provider note indicates Ms. Wilke stated she was still having seizures daily, and complained of fatigue. (R. 344). Dr. Waldman wrote Ms. Wilke was tolerating the VNS settings well "but still has a few seizures every few weeks." (R. 341). Her husband reported seeing his wife's head "drop." (R. 341). Under the heading "plan" Dr. Waldman wrote that Ms. Wilke's epilepsy was stable but still refractory. (R. 343).

*January 8, 2015*. Ms. Wilke and Dr. Waldman discussed medications and VNS settings. Dr. Waldman noted that Ms. Wilke was doing well on her current medications (Vimpat and Felbatol) and VNS. (R. 356). According to the non-provider note, Ms. Wilke's husband stated she was having at least two medium seizures per day and that some had been a little stronger than in the past. Ms. Wilke reported she was feeling well and there had been no changes since her last appointment. (R. 356).

*April 6, 2015*. Ms. Wilke was seen for a follow-up appointment with Dr. Waldman. They discussed VNS tolerance issues and her medication. Dr. Waldman wrote that Ms. Wilke was still having "about a seizure a week, maybe more" but "[o]verall she feels pretty well." (R. 358). Ms. Wilke described a recent seizure while with her mother at an art fair. In her interaction with the

non-provider Ms. Wilke said there had been no changes since the last appointment and she was still having mild daily seizures. She also complained of headache. (R. 361).

<u>Medical Opinions/Other Evidence</u>

State agency medical experts assessed Ms. Wilke's RFC at both the initial and reconsideration stages of Ms. Wilke's DIB benefits claim. A physical RFC assessment based on then available medical and other records was made by Dr. Gary Cromer, M.D. in connection with the SSA's initial disability determination. His assessment is dated October 14, 2013. Dr. Sandra Davis, PhD, completed the mental component of the RFC assessment. Her assessment is dated December 27, 2013.

Dr. Cromer determined Ms. Wilke had a severe medically determinable impairment of partial seizure disorder which did not equal any reference listing. He believed Ms. Wilke's credibility was eroded by inconsistencies with the medical record. He viewed the record as indicating Ms. Wilke was having "far fewer" seizures than the three per day she alleged. (R. 76). Dr. Davis, on the other hand, found Ms. Wilke's allegations "mostly credible" but giving "considerable weight" to information from Ms. Wilke's former employer, Orchard Place, concluded her mental health limitations did not preclude all work-related functioning. She viewed Ms. Wilke as having more issues with respect to her epilepsy than her depression. (R. 78). Based on these assessments the initial determination was that Ms. Wilke was not disabled by epilepsy and depression.

On reconsideration, Dr. Jan Hunter, D.O., reviewed the physical RFC assessment. On February 26, 2014 he wrote that Ms. Wilke had not alleged a worsening of her condition and a review of Broadlawns then current records (the last of which would have been for the January 20, 2014 visit) indicated Ms. Wilke was doing well with only a "very few small seizures." Dr. Hunter

concluded the initial RFC should be affirmed. (R. 89). Similarly, Dr. Scott Schafer, PhD, affirmed the initial mental RFC assessment. Ms. Wilke was again found not disabled. (R. 92).

At the request of Disability Determination Services Ms. Wilke underwent a mental status examination by a psychologist Dr. Cal J. Seda on November 8, 2013. In his written report Dr. Seda noted that Ms. Wilke had worked full time as a file clerk for Orchard Place before her position was terminated on June 28, 2013. She was receiving unemployment compensation and had been unable to find employment since her termination. (R. 293). Ms. Wilke complained of daily seizures which tended to be very mild, but resulted in some "staring off in space and occasional closing of her eyes." (R. 294). Her mood was "mildly depressed." (R. 294). Dr. Seda opined that "[o]verall [Ms. Wilke's] cognitive ability is estimated as low average," and that she was prone to forgetfulness. (R. 294). Dr. Seda believed seizure activity would cause Ms. Wilke to "lose her place in work processing" in that she could "lose track of what was being done, who she has talked to, and what she has seen." (R. 294). Dr. Seda diagnosed Ms. Wilke with depression and gave her a Global Assessment of Functioning ("GAF") score of 58. (R. 295).

Ms. Wilke's treating physician, Dr. Waldman, completed a "seizures" RFC form questionnaire on May 15, 2015. Dr. Waldman described Ms. Wilke as having daily seizures "or more than one a day," with loss of consciousness (R. 372). The seizures averaged 9-10 per week, 30-40 per month, and lasted 1-5 minutes. (R. 373). Under "postictal" (post-seizure) manifestations Dr. Waldman checked entries for confusion, exhaustion, severe headaches, muscle strain, and sleepy and said these would last 10 minutes to one hour. (R. 374). She responded "yes" to a question which asked if Ms. Wilke had a history of incontinence during a seizure. (R. 374). Dr. Waldman answered a question about medication side effects by checking entries for dizziness, eye focusing problems, lethargy, double vision, coordination disturbance and lack of alertness. (R.

374). Dr. Waldman answered "yes" to questions about whether Ms. Wilke's seizures were likely to disrupt the work of co-workers and whether she would require more supervision. (R. 375). Asked about tolerance for work stress, Dr. Waldman checked the entry that Ms. Wilke was capable of "low stress jobs." (R. 375). Given the work requirements for full-time sedentary or light work, Dr. Waldron checked "yes" to a question which asked if three or more days a month it would be likely Ms. Waldron's "pain/fatigue/nausea or side effects from medication compromise [her] ability to maintain sustained attention and the concentration to perform even single routine and repetitive tasks?" (R. 376). Finally, asked to describe other limitations that would affect Ms. Wilke's ability to work Dr. Waldman wrote:

> Trouble with attention concentration from seizures and meds.   R side is incoordinated due to R side affected by seizures. She has learning disabilities due to cortical malformation at birth.

(R. 376).

On December 17, 2013 Ms. Wilke's former employer completed a work performance assessment. (R. 209-210). It stated that Ms. Wilke did "competitive" work for Orchard Place as a file clerk from November 10, 2003 to June 28, 2013 averaging about 40 hours per week. Her performance was rated "adequate" in all categories except for her ability to carry out complex/detailed instructions and procedures for which she was rated "poor." (R. 209). After Ms. Wilke was married "there were increased calls that she would not be in to work due to illness." (R. 210). She remained motivated until the last month of her employment after being told her position was being eliminated. Orchard Place reported that Ms. Wilke was given special consideration compared to other similarly situated workers in the form of shorter hours, easier or lighter duties, and extra help or supervision. (R. 210). The assessment concluded: "We believe that she is capable of working in a full-time position that matches her skills and abilities." (R. 210).

# V.

# DISCUSSION

Cortical Malformation as a Severe Impairment

Ms. Wilke argues the ALJ erred in not including her cortical malformation as a severe impairment and assessing its effect on her functioning. The Commissioner responds Ms. Wilke failed to show the impairment was severe, noting she did not allege cortical malformation in her DIB application, and the record is inconsistent with a finding of severe impairment.

There is no dispute about the fact Ms. Wilke has a cortical malformation in the left hemisphere of her brain. That has been a consistent diagnosis from the first medical record in evidence from the Mayo Clinic. There is also no dispute about the fact that Ms. Wilke's epilepsy is causally related to her cortical malformation. Her argument here is founded on the diagnosis described by Dr. Waldman at the outset of Dr. Waldman's answers to the RFC seizures questionnaire. After the typed word "EPILEPSY" Dr. Waldman added in handwriting: "cortical malformation causing learning disability R side chronic incoordination and dystonia."[6] (R. 372). It is evident from Dr. Waldman's questionnaire answers that she considered the incoordination and dystonia to be side effects of Ms. Wilke's seizures. Asked to describe the clinical findings and test results that supported her diagnosis Dr. Waldman listed EEG results which showed a risk of seizures, Ms. Wilke's history of seizures, and the medications and VNS treatment she was receiving for the seizures. (R. 372). Dr. Waldman attributed Ms. Wilke's incoordination to the effect of seizures. (R. 374-375), and listed muscle strain as a post-seizure manifestation. (R. 374).

---

[6] Dystonia is "muscle spasm" (Pl. Brief [11] at 6). *See* http://www.merckmanuals.com/home/brain,-spinal-cord,-and-nerve-disorders/movement-disorders/dystonia

The severe physical impairment resulting from Ms. Wilke's cortical malformation was epilepsy. The cortical malformation and resulting epilepsy thus merge in the disability analysis. The ALJ thoroughly examined the seizure disorder associated with Ms. Wilke's epilepsy. Ms. Wilke's learning disability was included in Dr. Seda's assessment of her cognitive ability which he determined to be low average. The ALJ took Ms. Wilke's learning disability into account in determining Ms. Wilke's RFC. (R. 25).

That Ms. Wilke did not allege cortical malfunction in her DIB application is significant. *Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001); *see Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007). It was Ms. Wilke's burden to establish a claimed impairment, or combination of impairments, is severe. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see Baker v. Colvin*, 674 Fed. Appx. 613 (8th Cir. 2017). The burden is not onerous, but it is a showing the claimant must make. Ms. Wilke has not shown her cortical malfunction is a severe impairment apart from the severe impairment of epilepsy caused by the malformation, an impairment the ALJ found at the second stage of the analysis and analyzed in determining Ms. Wilke's RFC. The ALJ also appropriately considered Ms. Wilke's learning disability.

Ms. Wilke relies solely on the diagnosis quoted above from Dr. Waldman's questionnaire answers to argue cortical malformation should have been considered a severe impairment. (*See* Pl. Brief [11] at 6). As noted, the questionnaire answers attributed the physical conditions described in the diagnosis to Ms. Wilke's epileptic seizures. Ms. Wilke does not identify any evidence that the conditions result from the cortical malformation independent of the seizure disorder. In any event, a diagnosis is not alone sufficient to establish the cortical malformation was itself a severe impairment. *See Collins ex rel. Williams v. Barnhart*, 335 F.3d 726, 731 (8th Cir. 2003).

The Commissioner recites evidence in the record to argue Ms. Wilke's cortical malfunction is not severe because the incoordination, muscle problems and learning disability do not significantly limit her ability to work and are inconsistent with the non-work activities in which Ms. Wilke engaged. (Def. Brief [14] at 5-6). It is not necessary to engage in this analysis because the conditions described in Dr. Waldman's questionnaire diagnosis are wrapped up in the severe impairments of epilepsy and depressive disorder found by the ALJ. It does bear note, however, that the Broadlawns neurology clinic medical records and Dr. Waldman's notes contained in them do not provide any indication that incoordination or muscle problems are significant functional issues for Ms. Wilke. There are a few isolated references to dizziness and fatigue. (R. 318, 321, 344). The Mayo Clinic included "pre-existing right spastic hemiparesis" among its diagnoses (R. 268) which Dr. Waldman duly noted when she first saw Ms. Wilke (R. 283), but afterwards, on five occasions physical examination revealed Ms. Wilke had "[n]o weakness incoordination or nystagmus. Walks well." (R. 279, 304, 319, 338, 355). On another occasion, in addition to noting Ms. Wilke was walking well, physical examination showed "Gait, Strength, tone intact." (R. 284).

The ALJ did not err in failing to find Ms. Wilke's cortical malformation is a severe impairment.

<u>The RFC</u>

Ms. Wilke contends the ALJ's RFC assessment is not supported by substantial evidence because (1) the ALJ improperly gave "little weight" to the opinions of her treating neurologist, Dr. Waldman; (2) the ALJ improperly relied on the opinions of non-treating practitioners who evaluated her without examination, naming state agency medical experts Drs. Cromer and Hunter; and (3) the ALJ failed to credit the physical limitations to which she and her mother testified. The

ALJ's credibility assessments of Ms. Wilke and her mother are the subject of a separate assignment of error discussed below.

The ALJ gave "little weight" to the opinions of Dr. Waldman (R. 28), and "some weight" to the opinions of Drs. Cromer and Hunter as well of those of Drs. Davis and Shafer (R. 26-27). The ALJ gave "great weight" to the opinions of Dr. Seda other than as they related to Ms. Wilke's GAF score which the ALJ felt offered little help in assessing functional limitations. (R. 25).

Drs. Davis and Shafer assessed Ms. Wilke's mental RFC and found her mental limitations would not preclude work-related functioning. Dr. Seda performed a mental status examination. Ms. Wilke does not complain about the mental health assessments to the extent incorporated in the RFC finding. The fighting issue on RFC concerns the medical opinion evidence of Drs. Waldman, Cromer and Hunter on the subject of Ms. Wilke's physical capabilities and limitations occasioned by her seizure disorder.

In determining RFC the ALJ must consider all evidence in the record. *Julin v. Colvin*, 826 F.3d 1082, 1089 (8th Cir. 2016). The RFC is, however, "a medical question, and some medical evidence must support the RFC determination." *Id.* (citing *Wildman*, 596 F.3d at 969). As Ms. Wilke's treating physician, Dr. Waldman's opinions were "entitled to controlling weight [if] supported by medically acceptable techniques and not inconsistent with substantial evidence in the record." *Vance v. Berryhill*, 860 F.3d 1114, __, 2017 WL 2743089 at *4 (8th Cir. June 27, 2017) (citing *Julin*, 826 F.3d at 1088); *see* 20 C.F.R. § 404.1527 (c) (2)). If the ALJ gives less than controlling weight to the treating physician's opinions the ALJ must "give good reasons" for doing so. *Chesser*, 858 F.3d at 1164 (quoting *Anderson v. Astrue*, 696 F. 3d 790, 793 (8th Cir. 2012) in turn quoting 20 C.F.R. § 404.1527(c)(2)). One recognized good reason is if the treating physician's opinions "are themselves inconsistent." *Id.* (quoting *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir.

1996)); *see Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015); *Wildman*, 596 F.3d at 964. Indeed, a treating physician's opinions may even be disregarded if the treating physician has given inconsistent opinions. *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015)(citing *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015)).

The opinions of non-treating, non-examining medical sources will not normally suffice to constitute substantial evidence on the record as a whole. *Shontos v. Barnhart*, 328 F.3d 418, 425 (8th Cir. 2003); *see Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). There may, however, be particular circumstances in which a non-treating physician opinion can supply substantial evidence. *Vossen*, 612 F.3d at 1016; *see Smith v. Colvin*, 756 F.3d 621, 627 (8th Cir. 2014)(affirming denial of benefits where ALJ gave "significant weight" to state agency physical and mental assessments). For reasons indicated below, that is not the case here.

If Dr. Waldman's opinions in her RFC seizures questionnaire about the number of seizures and limitations resulting from them were given controlling weight Ms. Wilke could well be entitled to disability benefits. An average of 9-10 seizures a week would make it likely Ms. Wilke would have frequent seizures at work. If Dr. Waldman is believed, post-seizure manifestations would require a recovery period of 10 minutes to an hour, the seizures would disrupt the work of others, and together with the side effects would affect Ms. Wilke's ability to maintain attention and concentrate. The ALJ gave little weight to Dr. Waldman's opinions for two reasons -- they were on a fill-in-the-blank/checkoff a box form and were inconsistent with her clinical notes. (R. 27-28).

The first reason given, the format of Dr. Waldman's responses to the RFC seizure questionnaire, does not reasonably permit consignment of her opinions to the "little weight"

category. The Eighth Circuit has said "that a conclusory checkbox form has little evidentiary value when it 'cites no medical evidence, and provides little or no elaboration.'" *Anderson*, 696 F.3d at 794 (quoting *Wildman*, 596 F.3d at 964). While many of the questions on the RFC seizures questionnaire called for checkbox (or fill-in-the-blank/circle "yes" or "no") answers, they also asked Dr. Waldman for medical evidence and elaboration which she provided. She listed her diagnoses as quoted above. *Supra* at 13. She described clinical findings and test results which supported her diagnoses; an EEG showing a risk of seizure, "daily seizures or more than one a day," multiple medications and use of a VNS, learning disabilities and the cortical malformation at birth. (R. 372). Asked to describe limitations that would affect Ms. Wilke's ability to work, Dr. Waldman wrote Ms. Wilke had "trouble with attention concentration from seizures and meds," right side incoordination related to seizures, learning disabilities and the cortical malformation. (R. 376). Dr. Waldman's questionnaire descriptions of her diagnoses, findings, test results and Ms. Wilke's work limitations were not extensive, but they did provide medical evidence and a measure of elaboration.

The ALJ's second reason for discounting Dr. Waldman's opinions is on firmer footing. A reasonable person could consider Dr. Waldman's clinical notes as overall inconsistent with the level of seizure activity and resulting significant limitations described by Dr. Waldman in her questionnaire answers. On August 1, 2013 Ms. Wilke was happy with her seizure control. The seizures were mild and the Felbatol medication had markedly decreased the intensity. (R. 283). On September 18, 2013 Ms. Wilke was not using the VNS magnet because the seizures "weren't bad" and reported her seizure activity was manageable. (R. 281). On December 5, 2013 Dr. Waldman noted Ms. Wilke had had "a few small" seizures since she had last seen her some six weeks before, and no large seizures. Ms. Wilke was "doing pretty well." (R. 303). On January 20,

2014 it was noted Ms. Wilke was doing well with maybe "a few small seizures" since the December visit. (R. 298). On March 20, 2014 Ms. Wilke was unclear whether she had had any seizures in the previous two months, though Dr. Waldman believed she had had a few small seizures as a result of being without Felbatol for three days. (R. 318, 321). On July 2, 2014 Dr. Waldman's notes indicate Ms. Wilke was doing well with no seizures. (R. 329). On July 28, 2014 Ms. Wilke complained her VNS settings were too strong. Dr. Waldman wrote that "if auras or seizures come back she will let us know" which suggests Ms. Wilke was then having no seizures. (R. 337). Dr. Waldman's clinical notes for October 2, 2014 reflect Ms. Wilke was having "a few seizures every few days." (R. 341). On January 8, 2014 it was noted that Ms. Wilke was doing well on her current medications.  While Ms. Wilke's husband reported his wife was having two medium seizures daily, some stronger than before, Ms. Wilke said she was feeling well and there had been no changes since her October 2014 appointment. (R. 356). Finally, on April 6, 2015 Dr. Waldman wrote that Ms. Wilke was having "about a seizure a week, maybe more" but overall was feeling pretty well. (R. 358). Globally, Dr. Waldman's notes are most consistent with a refractory seizure disorder involving usually mild seizures which occur with variable frequency, and occasional periods of minimal seizure activity, which medication and the VNS have helped manage but not eliminate.

Dr. Waldman's diagnosis of chronic incoordination which she listed as a limitation on Ms. Wilke's ability to work is inconsistent with the Broadlawns clinical record which repeatedly recorded that on physical examination Ms. Wilke displayed no incoordination or problems walking. *See supra* at 15. Just as often Ms. Wilke's "[c]oncentration, language, memory and orientation" were noted to be intact. (R. 279, 284, 304, 319, 338, 355).

In other respects Dr. Waldman's clinical notes and the "non-provider information" in the Broadlawns medical records are consistent with 9-10 seizures per week given by Dr. Waldman in her questionnaire answers. In connection with the September 18, 2013 visit Dr. Waldman wrote Ms. Wilke's cortical malformation was presumably causing two to three seizures a day. (R. 278; *see* R. 281(non-provider information)). Non-provider information in the records reflect Ms. Wilke, or her husband, reported similar seizure frequency on other occasions. (*See* R. 331 (small seizures daily), R. 333 (daily seizures), R. 344 (daily seizures), R. 356 (at least two medium seizures per day)). The record nonetheless contains substantial evidence which supports the ALJ's assessment that the opinions given by Dr. Waldman in her questionnaire answers were in material respects inconsistent with Dr. Waldman's clinical notes. Those inconsistencies provided good reason for the ALJ to give less than controlling weight to Dr. Waldman's opinions. Whether her opinions should be discounted to the point of limited weight is a closer question, but, in view of the inconsistencies noted by the ALJ, where to place Dr. Waldman's opinions on the weight scale is a matter which must be left to the judgment of the ALJ. *See Papesh*, 786 F.3d at 1132 (treating physician opinion not entitled to controlling weight is still entitled to substantial weight unless inconsistent with the record or another of the physician's opinions).

Drs. Cromer and Hunter made, respectively, the initial and reconsideration RFC assessments of Ms. Wilke's physical functional capacity. Ms. Wilke complains the ALJ relied on their opinions in determining RFC. The ALJ gave "some weight" to the opinions of Drs. Cromer and Hunter, not controlling weight. Nor could the ALJ have given controlling (or substantial) weight to their opinions. The opinions of Drs. Cromer and Hunter were based on very limited medical information. Dr. Cromer had only the first three of the twelve relevant medical records in the file, the April 17, 2013 Mayo Clinic treatment record, and those of Ms. Wilke's August 1, 2013

and September 18, 2013 Broadlawns visits. He had "[n]o opinion evidence" in hand and no seizure questionnaire was available. (R. 76). Dr. Cromer opined the credibility of Ms. Wilke's claim to having three seizures per day was eroded by what he saw as Ms. Wilke's failure to follow up with her Mayo Clinic neurologist as recommended, her statements in the Broadlawns clinical record of her September 18, 2013 visit that she did not use the VNS magnet because "the seizures aren't bad" and the seizure activity was "manageable," and Ms. Wilke's statement to Dr. Waldman on August 1, 2013 that she was happy with her seizure control "in terms of them being mild." (R.76, 268, 278, 281, 283). Dr. Cromer believed this information, together with Ms. Wilke's reported activities of daily living, demonstrated Ms. Wilke was having "far fewer seizures than she claim[ed]." (R. 76). Dr. Cromer did, however, recognize that seizures might occur at work. He recommended an RFC limitation that Ms. Wilke "[a]void even moderate exposure" to work hazards. (R. 75; *see* R. 24 in which the ALJ tied this limitation to Ms. Wilke's "history of epilepsy and treatment for seizures."). Dr. Cromer did not discuss whether and to what extent workplace seizures would affect Ms. Wilke's ability to work by interrupting her work activities.

Dr. Hunter had only two more Broadlawns records at the time of his February 26, 2014 reconsideration assessment, those for her visits of December 5, 2013 and January 20, 2014. He merely quoted Dr. Cromer's report and, in a brief additional paragraph, noted Ms. Wilke did not allege a worsening of her condition and characterized the additional Broadlawns records as showing Ms. Wilke was doing very well with "only a few very small seizures." (R. 89).

As non-treating, non-examining medical sources whose record reviews were based on limited medical information, the opinions of Drs. Cromer and Hunter do not provide substantial evidence in support of the ALJ's RFC determination. *See Shontos*, 328 F.3d at 425. It is in the nature of the administrative progression that the ALJ may have medical information not available

to the state agency medical experts at the time of their assessments, but here Drs. Cromer and Hunter had little to go on and that affects the weight which could be accorded their opinions. The ALJ does not appear to have given their opinions inordinate weight in the RFC analysis.

Ms. Wilke had the burden to prove her RFC. *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). Once she demonstrated, as the ALJ found, that she was unable to perform past relevant work (R. 30), the burden of proof shifted to the Commissioner to prove, inter alia, that Ms. Wilke retained the RFC to do other kinds of work. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). Again, RFC is a medical question which must be supported by some medical evidence. *Julin*, 826 F.3d at 1089. "[T]he ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Eichelberger*, 390 F.3d at 591 (quoting *Nevland*, 204 F.3d at 858); *see Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004). With Dr. Waldman's opinions discounted, and those of Drs. Cromer and Hunter of limited value, the record is left with insufficient medical evidence of Ms. Wilke's physical ability to function in the workplace.

Such evidence is particularly important in view of Ms. Wilke's physical impairment. She has a history of seizures caused by her cortical malformation. She will have them in the future. She would on occasion have them at work.  The frequency of workplace seizures and their affect on Ms. Wilke's workplace functioning have not been the subject of expert medical opinion beyond what can be gleaned from Dr. Waldman's rejected opinions, and Dr. Seda's mental status exam in which he wrote seizure activity will cause Ms. Wilke to "lose her place in work process." (R. 294). By incorporating work hazard restrictions in the RFC, the ALJ implicitly recognized the RFC must contemplate workplace seizures (R. 23, 26), but when Dr. Waldman's opinions are put aside, there is no substantial medical evidence on the effect of workplace seizures on Ms. Wilke's ability to function at work.

Credibility Assessments of Ms. Wilke and her Mother

The ALJ found that Ms. Wilke's statements about "the intensity, persistence and limiting effects" of her symptoms were "not entirely credible." (R. 28.) In analyzing Ms. Wilke's subjective allegations the ALJ applied the *Polaski* factors outlined by the Eighth Circuit in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) as expanded upon in 20 C.F.R. § 404.1529. (R. 23, 28-29). In addition to the claimant's prior work record, these include "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain;[7] (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." *Bryant v. Colvin*, ___F.3d ___, 2017 WL 2803188, at *2 (8th Cir. June 29, 2017) (citing *Polaski*, 739 F.2d at 1322); *see* 20 C.F.R. § 404.1529.

At hearing Ms. Wilke testified she suffered three or four seizures a day, more frequent now than before, that she would have three to five bad days per week when she was so tired she would be unable to go to work and would be wiped out unable to accomplish much, most often she would have headaches after a seizure which would last two to three hours, and she would be confused, lack coordination, and have difficulty walking. (R. 47-51). Ms. Wilke's description of the frequency and debilitating effects of her seizures is inconsistent with much of the clinical record summarized previously. As the ALJ found, her testimony also conflicted with aspects of her functional reports submitted to the SSA. In these she said she daily prepared her own meals consisting of simple foods like sandwiches and frozen dinners (R. 203, 223); had no problems with her personal care (R. 201, 222); did housework such as laundry, dishes, dusting and taking the garbage out (R. 203, 223); daily engaged in activities such as reading, watching television, NASCAR, surfing the internet, playing computer games and playing with her dogs, all of which

---

[7] The second factor includes both pain and other symptoms. *See* 20 C.F.R. § 1529 (a).

she said she could do well (R. 205, 225); and on a regular basis went to church, attended sporting events, auctions and visited family (R. 205, 225). She also said she rarely went out alone because of her seizures and the possibility of becoming disoriented (R. 202, 224) and in preparing meals avoided knives, sharp objects and use of the stove for fear of cutting or burning herself. (R. 203, 223). The ALJ believed that Ms. Wilke's description of daily activities was "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (R. 29). Activities "which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001)); *see Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012).

The ALJ also found Ms. Wilke's work history affected her credibility. Ms. Wilke's employment ended for business reasons unrelated to her disabling impairments. (R. 29). Her job was eliminated. There was no evidence Ms. Wilke's condition had significantly deteriorated since she left employment. She evidently had performed the job of file clerk for Orchard Place adequately despite her impairments. She had worked in competitive employment for about 10 years.[8] "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *see Bryant*, ___ F.3d at ___, 2017 WL 2803188, at *3 (A "condition that was not disabling during working years and has not worsened cannot be used to prove present disability," (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994), in turn citing *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990)).

---

[8] Ms. Wilke claims her employment was "sheltered employment." The Orchard Place work performance assessment indicated Ms. Wilke needed frequent supervision and was given shorter hours, fewer or easier duties, and extra help, but described her work as "competitive" averaging about 40 hours per week. (R. 209-210).

24

Ms. Wilke's mother, Ms. Moore, testified her daughter might have several seizures during the course of a day during which she becomes stiff and immovable. Afterward she is tired and ready to call it a day. Frequency varied. Sometimes the seizures get better for a while and then worse, but Ms. Moore was convinced seizures occurred daily. Ms. Moore said her daughter sometimes lost bladder control, the last time about a year before the hearing. (R. 58-60). Ms. Moore's third-party function report echoed much of what Ms. Wilke wrote in her functional reports. (R. 191-198).

The ALJ gave little weight to the testimony and function report of Ms. Moore because she was neither medically trained nor disinterested. (R. 29). Most importantly, the ALJ found Ms. Moore's testimony, like that of Ms. Wilke, could not be squared with the preponderance of evidence in the medical record. The ALJ also questioned Ms. Moore's opportunity to observe the frequent seizure activity to which she testified. Ms. Moore testified she saw her daughter "once a week sometimes" when they would spend a few hours doing something like shopping. Ms. Moore's function report arguably and inconsistently suggested she spent more time with Ms. Wilke. (R. 29, 58, 191).

Ms. Wilke is particularly critical of two credibility related observations made by the ALJ. First, the ALJ said it was reasonable to infer from Ms. Wilke's Orchard Place work history that her impairments would not prevent performance of her Orchard Place job, but on the surface this seems inconsistent with the ALJ's finding in accord with the VE's testimony that Ms. Wilke is unable to perform any past relevant work. (R. 30). Second, the ALJ found it curious that in her seizure disorder questionnaire Ms. Wilke checked "no" in answer to the question "[d]o you drive a car?" and also checked "no" in answer to the next question "[h]as your license been restricted because of a seizure disorder?" (R. 234, *see* R. 23). These answers are not inconsistent. Ms. Wilke does not

drive and does not have a driver's license which could be restricted. (R. 44). The questionnaire did not ask if Ms. Wilke had a driver's license.

The inclusion of these observations in the ALJ's decision does not compel reversal of the credibility findings. That Ms. Wilke's impairments appear not to have affected performance of her Orchard Place job is relevant even if she cannot return to that work. Ms. Wilke's questionnaire responses concerning a driver's license were only briefly mentioned by the ALJ in the factual background portion of the RFC without any comment about significance.

The ALJ gave good reasons for finding Ms. Wilke was not entirely credible and what Ms. Moore had to say was entitled to little weight. The Court must defer to the judgment of the ALJ in assessing their credibility even though the ALJ did not address each *Polaski* factor in depth. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012)(citing *Perkins*, 648 F. 3d at 900).

## VI.

## CONCLUSION, RECOMMENDATION AND ORDER

The ALJ's decision is supported by substantial evidence except with respect to the RFC finding. The problem with the RFC finding is the paucity of medical evidence to support it. Ms. Wilke has a history of epilepsy causing her to have seizures. Even if Dr. Waldman's opinions are discounted and Ms. Wilke is not entirely credible, the medical history indicates it is probable some seizures would occur at work. Despite the limited information available to him, the principal agency examiner, Dr. Cromer, appears to have recognized the risk of workplace seizure activity. Without Dr. Waldman's opinions, and given the limitations of what state agency examiners were able to offer, the record is left with no credible or sufficient medical evidence on the effect of workplace seizures on Ms. Wilke's physical ability to work, and without it the RFC finding cannot be sustained.

The record does not compel a finding that Ms. Wilke is disabled. However, it is appropriate to reverse and remand the case to the Commissioner for further development of the record to obtain medical evidence which addresses the effect of Ms. Wilke's probable workplace seizures on her physical ability to function at the kind of work which might be suitable for her given all her limitations. Whether supplementation of the record includes consultative examinations, further treating physician information, updated medical records, and/or additional testimony from a VE to assess an employer's tolerance for work interruptions caused by seizure activity is best left to the judgment of the Commissioner.

For the reasons given, the undersigned **RECOMMENDS** that the decision of the Commissioner be **reversed and remanded** for further proceedings consistent with this Report and Recommendation. *See* 42 U.S.C. § 405(g).

IT IS ORDERED that the parties may file written objections to this Report and Recommendation pursuant to and within the time provided by 28 U.S.C. § 636(b)(1) and LR 72A. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of the right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

IT IS SO ORDERED.

Dated this 26th day of July, 2017.

_____
ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE